# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58475-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JODI SUE LINDQUIST, | |
| Appellant. | |

PRICE, J. — Jodi S. Lindquist appeals her conviction for second degree assault. Lindquist argues that (1) numerous pretrial competency hearings violated her constitutional right to privately confer with counsel at critical stages of the proceedings, (2) her right to not be tried for an offense unless she was competent was violated, (3) she received ineffective assistance of counsel, and (4) the cumulative effect of the trial court's errors deprived her of a fair trial. In addition, Lindquist brings claims in a statement of additional grounds (SAG).

We affirm.

## FACTS

### I. BACKGROUND AND FIRST COMPETENCY ORDER AND EVALUATION (OCTOBER)

In July 2022, Lindquist struck a person while driving her car and eventually fled the scene. Following an investigation, the State charged Lindquist with one count of second degree assault with a deadly weapon sentencing enhancement.

Shortly after the State charged Lindquist, the superior court ordered her to undergo an evaluation at the jail under RCW 10.77.060 to determine whether she was competent to stand trial. After some delays, a licensed psychologist and forensic evaluator from Western State Hospital (WSH) conducted a competency examination. The resulting evaluation, dated October 27, opined that Lindquist had the capacity to understand the nature of the proceedings against her and the capacity to assist in her defense and, thus, was competent to stand trial.

Following the receipt of the October evaluation, the trial court held a competency hearing and signed an order finding Lindquist competent based upon an agreement between the parties. Lindquist appeared remotely from the jail while her counsel was in the courtroom. Lindquist also appeared remotely from the jail and not in the same location as her counsel at six other pretrial hearings (seven total) leading up to her jury trial.

Shortly before the scheduled trial date, Lindquist's counsel filed a trial memorandum that expressed more concerns about Lindquist's competency. Defense counsel stated that Lindquist was experiencing "some type of mental break" at the time of the incident, but Lindquist was preventing him from asserting a mental health defense. Clerk's Papers (CP) at 59. He acknowledged that Lindquist had been found competent but stated that she "clearly [had] problems" and that he had not been able "to get her to listen to what [he] believe[d] [was] reason." CP at 59. Defense counsel was also worried that Lindquist would disrupt the trial.

The trial court held a hearing about defense counsel's concerns. Based on the defense memorandum, the State also had renewed concerns about Lindquist's competency. Defense counsel reiterated that Lindquist was preventing him from pursuing a mental health defense and that Lindquist may be unable to control herself during the trial. Nevertheless, the trial court

2

decided that the case would proceed to trial, reasoning that Lindquist had been previously deemed competent and that appropriate measures could be taken if Lindquist was unable to behave at trial.

## II. MISTRIAL AND ORDER FOR SECOND COMPETENCY EXAMINATION

The case proceeded to a jury trial. Almost immediately, Lindquist was disruptive. During the State's direct examination of its first witness, Lindquist stated, among other things, that the incident took place in a different town, that the case was "a mistrial," and that she was leaving. Verbatim Rep. of Proc. (VRP) (Dec. 14, 2022) at 121. The trial court quickly excused the jury, while Lindquist continued to call the case "a mistrial." VRP (Dec. 14, 2022) at 121. The trial court asked Lindquist to stop talking, but she continued, exclaiming that she was firing her attorney and would "sue the pants off of each and every one of you for doing this to me." VRP (Dec. 14, 2022) at 122. The trial court had Lindquist removed from the courtroom and said it was taking a recess to consider its options.

When the trial court returned, Lindquist continued to interrupt the trial court. Ultimately, the trial court declared a mistrial and ordered a second competency evaluation from WSH pursuant to RCW 10.77.060. The order stated that the examination was being ordered at the request of the parties and the trial court, in part, because of Lindquist's behavior at the trial.

Lindquist's defense counsel then moved to withdraw because of a breakdown in communication. The trial court granted defense counsel's motion and appointed new counsel to represent Lindquist.

## III. JANUARY 9 HEARING FOLLOWING MISTRIAL

On January 9, 2023, about three weeks after the mistrial, the trial court held a competency status hearing. Lindquist's new counsel informed the trial court that he was aware of the pending

order for a competency evaluation but that Lindquist wanted the trial court to consider modifying her conditions of release. The State responded that the second competency examination was scheduled for the next day and it opposed any changes to release conditions. The trial court denied the request to amend Lindquist's release conditions and set the matter over for two weeks pending the receipt of the second evaluation. Lindquist, who appeared remotely from the jail (while her counsel was in the courtroom), was given an opportunity to speak. During the hearing, the trial court did not provide guidance about how Lindquist could confer privately with her counsel.

IV. SECOND COMPETENCY EVALUATION (JANUARY)

The day after the January 9 competency hearing, Lindquist was examined again at the jail by the same WSH psychologist from her first evaluation, who came to the same conclusion. The psychologist noted in their report, dated January 18, 2023, that Lindquist had personality traits, such as rigidity of thinking, that influenced how she perceived the world. However, those personality traits did not rise to the level of a "diagnosable psychiatric disorder." CP at 301. The psychologist also opined that Lindquist's prior disruptions appeared to be related to her poor relationship with her prior counsel, frustration, and rigidity in thinking, not the "product of a current mental disease or defect" and that with a new counsel, Lindquist would likely be able to assist her attorney in her defense in the future. CP at 301. The psychologist concluded, again, that Lindquist was competent to stand trial.

The psychologist acknowledged that this conclusion might conflict with the experience of court personnel and noted that a more comprehensive evaluation could be requested to take place at WSH.

4

> Understanding that the opinion expressed above may be contrary to the experience of court personnel, should the court desire a more comprehensive evaluation it is recommended that this be ordered to be conducted on an inpatient basis at Western State Hospital which would allow for observation over a longer time period.

CP at 301.

Several days later, the trial court held a competency review hearing to consider the new evaluation, during which Lindquist and her new counsel appeared in person together.[1] At the outset of the hearing and in response to the trial court's question, Lindquist claimed that she was willing to work with her new defense counsel.

The parties had different positions on the evaluation—Lindquist's defense counsel requested that the trial court find Lindquist competent, but the State disagreed based on Lindquist's ongoing behavior. Ultimately, the trial court signed an order, consistent with the procedures set forth in RCW 10.77.060, finding that Lindquist was competent and setting the matter for trial.

V.  DEFENSE COUNSEL MOTION FOR A CONTINUANCE AND TRIAL MEMORANDUM

Several weeks later on March 20, the trial court heard a motion for a trial continuance from defense counsel based, again, on competency concerns. Defense counsel expressed serious reservations about Lindquist's ability to assist in her defense and requested a continuance so that an independent mental health expert could assess her competency. Without another evaluation, counsel stated there would "be a mess at trial." CP at 306.

---

[1] After the second competency examination but before the subsequent competency hearing, bail had apparently been posted for Lindquist and she was released from the jail. Lindquist appeared in person with her counsel at all hearings following her release.

The trial court denied the request for a continuance and for another evaluation, explaining that there was nothing new since the two previous evaluations finding Lindquist competent. The trial court stated,

> I am not going to grant this. There is no new information. Ms. Lindquist has been evaluated twice by State evaluators and she has no history that would lead me to believe she is not competent. Her behavior was such that the evaluations, I believe, were merited. She has maintained the entire time that she is competent. What the evaluators have stated that she has, I don't mean offense by this, is a personality disorder. She has a very strong personality and very fixed ideas; that does not make her not competent.

VRP (March 20, 2023) at 149.

But the trial court further stated that the Office of Public Defense (OPD) was free to hire an evaluator if it wanted to.

Following the March 20 hearing, defense counsel continued to express concerns. In a trial memorandum, counsel said that he had sought out resources through OPD to obtain an independent competency evaluation but discovered that court authorization was required. Counsel further stated that he was "anxious" as the case got closer to trial because he had been unable to have any meaningful conversations with his client about the substance of the case. CP at 78. Lindquist believed that there was a conspiracy against her because the State's witnesses were liars and the physical landscape where the incident took place had been changed. As a result, counsel anticipated that Lindquist would interrupt the upcoming trial. Counsel noted that Lindquist appeared to have more than a personality disorder, and he renewed his request for an independent evaluation.

Subsequently, a third competency examination occurred, but this time, it was conducted by an independent evaluator, Dr. Kenneth Muscatel, not through WSH. It appears that defense

counsel sought an independent evaluation as invited by the trial court, but that it was not an evaluation obtained under the processes of RCW 10.77.060. Unlike the two previous evaluations conducted by WSH, our record contains no orders appointing the evaluator or staying proceedings pending the results of the examination under RCW 10.77.060.

## VI. INDEPENDENT COMPETENCY EVALUATION—DR. MUSCATEL (APRIL)

Dr. Muscatel's resulting independent evaluation included a lengthy discussion of Lindquist's mental condition. Dr. Muscatel opined that Lindquist had a clinically significant personality disorder and a possible mood instability that would impair thinking, judgment decision making, emotional regulation, and impulse control. Although Dr. Muscatel believed that Lindquist met the first aspect of competency because she understood the charges and her legal peril, he expressed concerns about her ability to maintain appropriate behavior during trial. Dr. Muscatel was also concerned about Lindquist's ability to put forth an effective defense due to her refusal to consider a mental health defense. However, Dr. Muscatel emphasized that "making poor decisions about defensive strategy is not the same thing as being incompetent." CP at 332.

In the end, Dr. Muscatel's opinion appeared to be somewhat noncommittal. He stated that Lindquist would be competent to proceed to trial and rationally able to assist in her defense, "*If [Lindquist] [could] manage her behavior appropriately during her trial*." CP at 332 (emphasis added). But if Lindquist repeated her behavior from the first trial, then "it is likely that she [is] unable to manage her thinking and behavior" and she would be incapable to rationally assist in her defense. CP at 332. According to Dr. Muscatel, Lindquist's competency to stand trial could not be known without actually going to trial; he stated:

7

> The only way to determine this is to proceed to trial. Thus, while I have very significant concerns about her current competence, the only test will be to see how she copes with the demands and stresses of her trial. If she can manage her behavior and consult effectively with her attorney, even if she displays what others would presume to be poor judgment and poor decision-making about her defense, that would not be sufficient to conclude that she cannot rationally participate in her own defense. She asserted to me and Dr. LeCompte that she can, but I have my concerns. The only way to determine will be to test the proposition.

CP at 333.

Dr. Muscatel's independent evaluation was briefly discussed during a May 22 hearing. Defense counsel stated that Dr. Muscatel made a "careful finding of . . . my client, she is able to proceed forward to trial . . ." and that he had adequate time to prepare for trial. VRP (May 22, 2023) at 173. Neither party asked the trial court to address competency based on the evaluation and, beyond asking for a copy of the evaluation for filing and ordering that the report be sealed, the trial court did not further address it. The trial court did not enter any orders regarding competency or un-staying the proceedings (as would be expected if Dr. Muscatel's evaluation was ordered under RCW 10.77.060).

VII. BENCH TRIAL, VERDICT, SENTENCING, AND APPEAL

Lindquist waived her right to a jury, and the case proceeded to a bench trial. Several witnesses testified at trial about the incident, including the victim. Lindquist also testified in her defense. Notably, unlike during her first trial, Lindquist behaved appropriately throughout the trial and did not interrupt the proceedings.

The trial court found Lindquist guilty of second degree assault with a deadly weapon and entered written findings of fact and conclusions of law consistent with its oral decision. Among the trial court's findings were that Lindquist intentionally struck the victim with her car and that

Lindquist's testimony was not credible.  At sentencing, the trial court imposed a standard range sentence of six months (with credit for time served) and no community custody.

Lindquist appeals.

## ANALYSIS

Lindquist makes four main arguments.  First, Lindquist argues that the trial court violated her constitutional right to privately confer with counsel at numerous critical stages of the proceedings.  Second, Lindquist argues that her right to not be tried for an offense unless she was competent was violated because of an inadequate competency evaluation from Dr. Muscatel.  Third, Lindquist argues that she received ineffective assistance of counsel.  And fourth, Lindquist argues that the cumulative effect of the trial court's errors deprived her of a fair trial.  In her SAG, Lindquist appears to raise numerous additional claims.  We address each in turn.

## I.  RIGHT TO CONFER WITH COUNSEL

Lindquist argues that her constitutional right to confer with counsel was violated at eight pretrial hearings, seven of which occurred prior to her mistrial, and that the State cannot demonstrate that these violations were harmless beyond a reasonable doubt.  We disagree.

### A.  LEGAL PRINCIPLES

Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution, a criminal defendant has the right to counsel at critical stages in the litigation.  *State v. Heng*, 2 Wn.3d 384, 388, 539 P.3d 13 (2023).  "But not all pretrial hearings are critical stages."  *Id.* at 392.  A "critical stage is one where 'a defendant's rights may be lost, defenses waived, privileges claimed or waived, or in which the outcome of the case is otherwise substantially affected.' "  *Id.* (internal quotation marks omitted) (quoting *State v. Heddrick*,

166 Wn.2d 898, 910, 215 P.3d 201 (2009)). We examine a hearing's " 'substance and not merely [its] form' " to determine whether a particular hearing was a critical stage. *Id.* (alteration in original) (quoting *State v. Jackson*, 66 Wn.2d 24, 28, 400 P.2d 774 (1965)).

This right to counsel includes the ability for a defendant to confer meaningfully and privately with their attorney at all critical stages of the proceedings. *State v. Dimas*, 30 Wn. App. 2d 213, 219, 544 P.3d 597, *review denied*, 3 Wn.3d 1026 (2024). The trial court is responsible for ensuring that attorneys and clients have the opportunity to engage in private consultation. *Id.* In determining whether the right to confer has been violated, "reviewing courts should consider the totality of the circumstances, including whether the trial court explicitly established a process for such communications, given the variety of different circumstances that may occur." *State v. Bragg*, 28 Wn. App. 2d 497, 507, 536 P.3d 1176 (2023) (emphasis omitted).

When a defendant is provided with counsel, but they are deprived of their right to meaningfully confer with that counsel, we apply a constitutional harmless error analysis. *Dimas*, 30 Wn. App. 2d at 219-220. Thus, the State has the burden of proving harmlessness beyond a reasonable doubt. *Id.* at 220.

"We generally decline to address moot issues." *State v. Shreve*, 28 Wn. App. 2d 785, 789, 538 P.3d 958 (2023).

B. APPLICATION

Lindquist argues that the trial court violated her right to confer with her counsel at eight pretrial hearings when she was separated from counsel and the trial court did not establish guidelines to enable private consultation. She characterizes these hearings as critical stages because they pertained "primarily" to Lindquist's competence to stand trial. Br. of Appellant at

10

39. Lindquist also argues that the State cannot demonstrate that the outcome of the proceedings could not have been impacted by this violation. Seven of the pretrial hearings that Lindquist contends violated her right to confer with counsel occurred before her first trial, one occurred after the mistrial.

The State responds that the mistrial moots Lindquist's complaints for seven of the eight hearings about which she raises the issue. For the single hearing that occurred after the mistrial, the State argues that Lindquist's right to confer was not violated because it was not a critical stage. We agree with the State.

The State supports its position that all the hearings prior to the mistrial are moot with a citation to *State v. Kinsey*, 7 Wn. App. 773, 774, 502 P.2d 470 (1972), *review denied*, 82 Wn.2d 1002 (1973). In *Kinsey*, the court stated, "A retrial of an action . . . places the parties in the same position as if there had been no trial in the first instance." *Id.* Because a mistrial restarts the process, the State argues that it follows that any potential violations of Lindquist's right to confer prior to the mistrial are essentially rendered harmless and moot.

Lindquist disagrees, arguing that *Kinsey* is distinguishable and that the correct standard is constitutional harmless error; that is, whether the State can prove beyond a reasonable doubt that the errors had no effect on the outcome of the proceedings.

But Lindquist cites no authority consistent with her view that a mistrial is inconsequential in this context. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."). And the State is accurate when it asserts that a mistrial generally starts the process over, especially when the

reasons for the mistrial were created by the defendant. 14A DOUGLAS J. ENDE, WASHINGTON PRACTICE: CIVIL PROCEDURE § 30.42, at 311 (3d ed. 2018) ("It is generally said if a mistrial is declared, the original trial is considered nugatory and for most purposes is treated as if it had never occurred."); *see also* 5 LESTER B. ORFIELD, ORFIELD'S CRIMINAL PROCEDURE UNDER THE FEDERAL RULES § 33:60, at 363 (1987) ("The declaration of a mistrial renders nugatory all trial proceedings with the same result as if there had been no trial at all. . . . The parties are returned to their original positions and, at the new trial, can introduce new evidence and assert new defenses not raised at the first trial.").

From these authorities, we are unpersuaded that a heightened standard of constitutional harmless error standard would apply to these pre-mistrial hearings. Thus, we hold that any alleged violations of Lindquist's right to confer that occurred before the mistrial were rendered harmless and moot. *See Shreve*, 28 Wn. App. 2d at 789 ("An issue is moot when we are unable to provide effective relief.").

Apart from these pre-mistrial hearings, Lindquist also argues that her right to confer with counsel was violated at one hearing *after* her mistrial—the January 9 hearing held with Lindquist's new counsel. Lindquist contends that this eighth hearing was a critical stage because it "pertain[ed] to whether further competency proceedings were . . . necessary . . . ." Br. of Appellant at 46. We disagree.

The January 9 hearing occurred three weeks after the mistrial and one day before the second competency examination took place. At the hearing, Lindquist's new counsel informed the trial court that he was aware of the pending competency examination but that he wanted to address release conditions. The trial court rejected the request; it made no changes to the release conditions

and merely set over the competency hearing two weeks, pending the expected receipt of the second competency evaluation. That was all. Nothing about the hearing involved anything about the potential loss of Lindquist's rights, defenses, privileges, or the outcome of the case.[2] *See Heng*, 2 Wn.3d at 395. Thus, this hearing was not a critical stage of the proceedings. And because this hearing was not a critical stage, the trial court did not violate Lindquist's right to confer.

## II. COMPETENCY

Lindquist next argues that the trial court erred by relying on the third competency evaluation from Dr. Muscatel to find her competent. She argues that her rights to not be tried for a criminal offense unless she was competent were violated because the evaluation was defective. We disagree.

## A. LEGAL PRINCIPLES

A criminal defendant has a fundamental due process right not to be tried if they are incompetent to stand trial. U.S. CONST. amend. XIV; *State v. McCarthy*, 193 Wn.2d 792, 800, 446 P.3d 167 (2019). The legislature has codified this principle under RCW 10.77.050, which provides, "No incompetent person shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues." A defendant is competent to stand trial "if [they]

---

[2] Indeed, our Supreme Court has determined on several occasions that a hearing during which initial release conditions are established is not a critical stage. *State v. Charlton*, 2 Wn.3d 421, 427-28, 538 P.3d 1289 (2023); *see also Heng*, 2 Wn.3d at 395 (holding that defendant's preliminary hearing, where the trial court appointed counsel, set financial conditions, and a plea of not guilty was entered, was not a critical stage). In *Charlton*, our Supreme Court held that the defendant's first three hearings, which included financial conditions being set by the trial court, did not amount to critical stages of litigation because they had no demonstrable effect on the outcome of the case. 2 Wn.3d at 427-28. This was particularly so because the defendant was released from custody at a fourth hearing. *Id.* at 428. Here, like the defendant in *Charlton*, Lindquist was released from custody soon after the January 9 hearing.

[have] the capacity to understand the nature of the proceedings against [them] and [they] can assist in [their] own defense." *State v. Coley*, 180 Wn.2d 543, 551-52, 326 P.3d 702 (2014); *see* former RCW 10.77.010(16) (2022).

Chapter 10.77 RCW controls the procedures and standards trial courts use to evaluate the competency of defendants. *Coley*, 180 Wn.2d at 551. When there is a doubt as to the defendant's competency, the trial court must review the allegation of incompetency. RCW 10.77.060(1)(b). The trial court may order an evaluation and report on the defendant's mental condition sua sponte or on the motion of any party. *See Coley*, 180 Wn.2d at 552. In determining whether a competency hearing is necessary, the trial court considers several factors, including "the defendant's behavior, demeanor, appearance, personal and family history, and psychiatric reports." *McCarthy*, 193 Wn.2d at 801. Moreover, the trial court should give "considerable weight" to a defense attorney's opinion regarding his or her client's competency. *Id.* (internal quotation omitted). The party challenging competency must prove by a preponderance of the evidence that the defendant is incompetent. *Coley*, 180 Wn.2d at 557.

However, "[o]nce the trial court makes a determination that a defendant is competent, it need not revisit competency unless 'new information' exists that shows the defendant's mental condition has changed since being found competent to stand trial." *State v. Fedoruk*, 5 Wn. App. 2d 317, 335-36, 426 P.3d 757 (2018) (quoting *State v. Ortiz*, 119 Wn.2d 294, 301, 831 P.2d 1060 (1992)), *review denied*, 192 Wn.2d 1012 (2019).

We review a trial court's determination of the adequacy of a statutory competency evaluation for an abuse of discretion. *State v. Sisouvanh*, 175 Wn.2d 607, 620, 290 P.3d 942 (2012). We also review a trial court's competency determination for an abuse of discretion. *State*

*v. Ortiz-Abrego*, 187 Wn.2d 394, 402, 387 P.3d 638 (2017). A trial court abuses its discretion if its decision is manifestly unreasonable or is based on untenable grounds. *Id.* A trial court's decision is manifestly unreasonable or based on untenable grounds if it results from applying the incorrect legal standard or is not supported by the record. *Id.*

B. APPLICATION

Lindquist's argument is premised on her contention that Dr. Muscatel's independent evaluation was inadequate because it did not provide an ultimate decision on Lindquist's competency to stand trial. Lindquist argues that, at most, Dr. Muscatel's evaluation was uncertain as to Lindquist's competence. As a result, Lindquist contends that the evaluation did not provide the information necessary for the trial court to decide Lindquist was competent and that the trial court erred by "relying in any way on this inadequate report to permit Lindquist to stand trial . . . ." Br of Appellant at 64. We disagree.

Here, it is true that Dr. Muscatel's evaluation, by concluding that Lindquist's competency to stand trial could only be discerned if she actually went to trial, fell short of providing a meaningful competency opinion. But prior to this independent evaluation, at the March 20 hearing where defense counsel raised continuing competency concerns, the trial court rejected ordering a new WSH evaluation, explaining that there was no "new information" that warranted ignoring the two previous evaluations that determined Lindquist was competent. VRP (March 20, 2023) at 149. From this sequence, it appears the Dr. Muscatel evaluation was *not* the product of an order under RCW 10.77.060 from the trial court (unlike the two previous WSH evaluations, our record includes no order under RCW 10.77.060 and no order staying the proceeding), but it was merely an independent evaluation secured by defense counsel.

15

Thus, it follows that the trial court was not asked to make, nor did it make, any decision about Lindquist's competency after the receipt of Dr. Muscatel's independent evaluation. Without the evaluation being a product of an order under RCW 10.77.060, there simply was no cause or requirement for the trial court to make any decision about it. Indeed, Lindquist has not demonstrated that the trial court relied on the independent evaluation in any way.[3] The only thing that happened after defense counsel received the evaluation, was that counsel suggested that he believed Lindquist was competent and that he was prepared for trial. When the entire context is considered, Lindquist has not demonstrated that the trial court made a decision (or failed to make a decision) that was manifestly unreasonable or based on untenable grounds. Accordingly, the trial court did not abuse its discretion.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Lindquist argues that she received ineffective assistance of counsel because (1) her counsel allowed her to proceed to trial when Dr. Muscatel's evaluation was inadequate, (2) her counsel mischaracterized Dr. Muscatel's evaluation to the trial court and that mischaracterization reflected a misunderstanding of the factual circumstances, and (3) her counsel had reservations about her competency. All three arguments appear to share the same foundational base—that Lindquist was potentially incompetent to stand trial and that Dr. Muscatel's evaluation was insufficient to

---

[3] Lindquist has not made any argument that Dr. Muscatel's evaluation was "new information" that should have triggered the trial court to "on its own motion" order another WSH evaluation under RCW 10.77.060. In fact, Dr. Muscatel's evaluation, while perhaps less than clear, did not wholly contradict WSH's earlier evaluations—in that Dr. Muscatel did not clearly opine that Lindquist was incompetent.

determine the issue. Because Lindquist cannot show prejudice, we disagree that she received ineffective assistance.

To show ineffective assistance of counsel, the defendant must demonstrate (1) that their counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013). Failure to establish either prong is fatal to the claim. *Strickland*, 466 U.S. at 700.

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). We strongly presume that counsel's performance was reasonable. *Id.* Generally, counsel's performance is not deficient when counsel's conduct can be characterized as a legitimate trial strategy or tactic. *Id.*

To show prejudice—the second prong of the *Strickland* test—the defendant must demonstrate a reasonable probability that the outcome of the proceeding would have been different if counsel had not performed deficiently. *See State v. Bertrand*, 3 Wn.3d 116, 129, 546 P.3d 1020 (2024).

Here, Lindquist contends that she can meet the requirement for prejudice because Lindquist was allowed to proceed to trial "irrespective" of her competency in violation of her constitutional and statutory rights to not be tried while incompetent. Br. of Appellant at 70. Lindquist further contends that if her counsel had recognized what Dr. Muscatel's evaluation actually said and had sought to protect his client's rights, there is a reasonable probability that the outcome of the proceedings would have been different.

Even assuming that defense counsel was deficient, Lindquist cannot demonstrate prejudice. Her entire argument for prejudice is premised on her being potentially incompetent to proceed to trial, but this is contrary to the record. Not only did the first two competency evaluations conclude that Lindquist was competent, even Dr. Muscatel's faulty evaluation offers no support for the opposite conclusion. Dr. Muscatel opined that Lindquist would be competent if she was able to manage her behavior during trial. Dr. Muscatel stated:

> If she can manage her behavior and consult effectively with her attorney, even if she displays what others would presume to be poor judgment and poor decision-making about her defense, that would not be sufficient to conclude that she cannot rationally participate in her own defense.

CP at 333. And yet, Lindquist identifies no evidence in the record that Lindquist behaved inappropriately during her second trial, so Dr. Muscatel's qualifier was met. Indeed, the fact that Lindquist was able to conduct herself appropriately means that two experts, in three evaluations, both in effect concluded that Lindquist was competent to stand trial.

Thus, without any support in the record that Lindquist was incompetent, Lindquist fails to show a reasonable probability that the outcome of the proceedings would have been different even assuming her counsel performed deficiently. Her ineffective assistance of counsel claim fails.

IV. CUMULATIVE ERROR

Lindquist argues that the cumulative error doctrine warrants reversal of her convictions. We disagree.

The cumulative error doctrine provides that a defendant may be entitled to a new trial when cumulative errors result in a fundamentally unfair trial. *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Under the cumulative error doctrine, the defendant must show that the

18

combined effect of multiple errors requires a new trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). The cumulative error doctrine may warrant reversal, even if each error standing alone would otherwise be considered harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). This doctrine does not apply when "the errors are few and have little or no effect on the outcome of the trial." *Id.*

Here, Lindquist has not established that any error, or combination of errors, denied her a fair trial. Therefore, we hold that the cumulative error doctrine is inapplicable.

V. SAG

Lindquist filed a SAG that includes many handwritten pages with varying degrees of legibility. Although a careful review reveals several phrases relevant to important legal concepts such as Miranda rights, speedy trial rights, and civil rights, the SAG lacks sufficient clarity to inform us of the nature or occurrence of any errors. Therefore, we are unable to consider it. RAP 10.10(c) (explaining that we will not consider SAG claims that fail to inform us of the nature and occurrence of the alleged error).

CONCLUSION

We affirm.

No. 58475-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

VELJACIC, A.C.J.

VEL., J.